FbjWleaS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              13 Cr. 271 (LTS)

5

     RAHJOHN LEARY,
6
                                              Sentence
7              Defendant.

8    ------------------------------x

9                                             New York, N.Y.
                                              November 19, 2015
10                                            2:30 p.m.

11

12   Before:

13                  HON. LAURA TAYLOR SWAIN,

                                              District Judge
14

15                       APPEARANCES

16   PREET BHARARA
          United States Attorney for the
17        Southern District of New York
     JUSTINA L. GERACI
18        Assistant United States Attorney

19

     JOYCE C. LONDON
20   JAMES BELL
          Attorneys for Defendant

21

22

23

24

25

FbjWleaS

1          (Case called)

2          MS. GERACI:  Good afternoon, your Honor.  Justina

3    Geraci, for the government, and I'm joined at counsel table by

4    Paterson Police Det. Steven Santee.

5          THE COURT:  Good afternoon, Ms. Geraci and Det.

6    Santee.

7          MR. BELL:  For Mr. Leary, James Bell.  Judge, good

8    afternoon.  I'm here with Ms. London.

9          THE COURT:  Good afternoon, Mr. Bell.

10         Good afternoon, Mr. Leary.

11         Good afternoon, Ms. London.

12         Good afternoon as well to the family members, victims,

13   and other spectators who are here in court today.  Thank you

14   all for coming.

15         We are here today for sentencing.  I have received and

16   reviewed the presentence investigation report, which is dated

17   October 1, 2015, including the recommendation and addendum, as

18   well as the defense submission dated November 10, 2015, which

19   was accompanied by 16 letters in support of Mr. Leary,

20   including letters from his mother, grandmother, brother,

21   several other relatives, and the mother of his child, as well

22   as a letter from Mr. Leary himself, and a certificate of his

23   participation in the Bureau of Prisons recreational basketball

24   league.

25         I've also received the government's November 13, 2015,

FbjWleaS

1    submission and an additional letter from defense counsel dated

2    November 17, 2015, which was accompanied by a certificate

3    earned by Mr. Leary from the MDC education department.  This

4    morning, the government provided the Court with a letter from

5    the grandmother of the man who was shot and killed in the 2010

6    incident for which Mr. Leary is being prosecuted in New Jersey.

7             Are there any other written submissions that the

8    parties intend me to have considered in connection with the

9    sentencing?

10            MS. GERACI:  I don't believe so, your Honor.

11            MR. BELL:  No, Judge.

12            THE COURT:  And I note that the defense has made

13   certain very limited redactions in the publicly filed version

14   of its submission.  I approve those redactions which are

15   consistent with the rules that apply in federal court, and so

16   the original submission will be filed under seal.

17            Mr. Bell, have you read the presentence report and

18   discussed it with Mr. Leary?

19            MR. BELL:  Yes, ma'am, I have.

20            THE COURT:  Mr. Leary, have you yourself reviewed the

21   presentence report?

22            THE DEFENDANT:  Yes.

23            THE COURT:  And have you discussed it with your

24   attorneys?

25            THE DEFENDANT:  Yes.

FbjWleaS

1     THE COURT:  Mr. Bell, do you have any objections or

2  other issues with respect to the content of the report that you

3  wish to address at this time?

4     MR. BELL:  I do not, Judge.

5     THE COURT:  Thank you.

6     Ms. Geraci, does the government have any objections or

7  other issues with respect to the content of the report?

8     MS. GERACI:  Your Honor, the only issue was addressed

9  on page 4 of the government's submission, just noting that the

10  PSR had indicated that the defendant was an associate of a set

11  of the Bloods, the 9-3 set.  The government has information to

12  suggest that he is actually a member of that set.

13     THE COURT:  Now, that brings me to the matters that

14  were raised in the November 17 letter from the defense, and I

15  did want to give you an opportunity to respond to those.  As I

16  read the letter with respect to that gang membership issue, it

17  doesn't seem to dispute that Mr. Leary admitted that he was a

18  member of that set of the Bloods, but it does dispute his

19  reason for requesting certain housing in his previous

20  incarceration.  Does the government take issue with that

21  specific contention?

22     MS. GERACI:  We do, your Honor.  We have a signed gang

23  member identification form from the defendant that indicates

24  not only that he has acknowledged he's a member of the Bloods

25  but specifically that he is a member of the 9-3 Hillside

FbjWleaS

1   Beehive set of the Bloods.  In this identification form, which

2   I've sent to defense counsel and I'm happy to submit to the

3   Court, he also requests to be housed with other positively

4   identified Bloods gang members and admits to being a member of

5   the Bloods gang for approximately four months.  It's signed and

6   dated by the defendant.

7            THE COURT:  Mr. Bell, does the defense still press its

8   contention that he did not make a gang member-related housing

9   request?

10           MR. BELL:  It is our position, Judge, that at the time

11  that he signed this document, he was 17 years of age and had

12  been asked other questions other than what was on this

13  document, and that based on the fact that he knew that there

14  were family members who were being held at that particular

15  facility, he wanted to be housed with them.  And I believe the

16  way we understand it, in order to be housed in that particular

17  unit, he indicated that he wanted to, in order to be housed in

18  that unit, he had to sign this document indicating that he was

19  indeed a Bloods member to be housed in that unit at the time.

20  That's our position, Judge.

21           THE COURT:  Thank you, Mr. Bell.  Are you disputing

22  that Mr. Leary was a self-acknowledged member of the Bloods?

23           MR. BELL:  You're asking me, Judge?

24           THE COURT:  Mr. Bell, are you disputing that?

25           MR. BELL:  I'm sorry.  I'm not disputing that he

FbjWleaS

1  signed the form and acknowledges on the form that he is a

2  member of the Bloods.  I'm not disputing that.

3       THE COURT:  Are you claiming that the information he

4  put on the form was not truthful?

5       MR. BELL:  Not that it's not truthful, Judge.  I just

6  don't believe that the docket further indicates that there was

7  another reason for him wanting to be housed, which is to be

8  with family members who were also in that facility.

9       THE COURT:  So an additional reason rather than a

10  reason that's necessarily contrary to the information in the

11  form.

12       MR. BELL:  One second.

13       (Pause)

14       MR. BELL:  Well, I would add, though, Judge, that he

15  was told at the time that he could not be housed in that

16  particular area unless he signed.  I'll leave it at that.

17       THE COURT:  Thank you.

18       Ms. Geraci.

19       MS. GERACI:  Your Honor, I'd just further note that he

20  admitted to being a member in his postarrest statements to law

21  enforcement of the 230 boys, which is a feeder for the 9-3 set,

22  and cooperators in fact have told us that Mr. Leary frequently

23  associates himself both with the original feeder group and with

24  the 9-3.  So we have other information aside from the form,

25  which seemed to be a very clear piece of information, that he

7

FbjWleaS

1    is more than just an affiliate of this set.

2              THE COURT:  Thank you.  It does seem to me that the

3    government's representations, including representations as to

4    corroborative evidence and Mr. Leary's own statements, are

5    indicative of his membership in the Bloods.

6              Ms. Geraci, is the government applying to have

7    Mr. Leary credited with the third point for acceptance of

8    responsibility?

9              MS. GERACI:  Yes, your Honor.

10             THE COURT:  That application is granted and it is

11   already reflected in the presentence report computations.

12             What is the government's position as to forfeiture?

13             MS. GERACI:  The government is not seeking forfeiture

14   with respect to Mr. Leary.

15             THE COURT:  Very well then.  Since there's no

16   information from which I could properly formulate a forfeiture

17   obligation, there will be no forfeiture obligation imposed.

18             What is the status of the New Jersey case?

19             MS. GERACI:  Your Honor, I've spoken to the prosecutor

20   in that case.  My understanding, and I have a copy of a writ

21   here, is that Mr. Leary is set for sentencing on December 3.

22   Just one moment; I want to check that date, your Honor.

23             Yes.  I'm sorry, your Honor.  It should be December 3.

24   He is scheduled per this writ to appear in court for

25   sentencing.  He has already pled guilty, and I believe that

FbjWleaS

1   date is in my submission, sometime in April, in connection with

2   that case.

3             THE COURT:  Thank you.

4             I'm now ready to hear from counsel further on

5   sentencing issues.  Mr. Bell.

6             MR. BELL:  Thank you, Judge.  I would indicate this.

7   As you know, my client, our client, has already pled guilty and

8   fully has accepted responsibility in this matter.  I note that

9   very early on in our discussions with Mr. Leary, he indicated

10  to us that it was always his intention to take a plea in this

11  matter and to try to move forward with the plea as quickly as

12  possible.  The government and Ms. London and I have had

13  multiple conversations in an attempt to try to get a much

14  earlier plea date.  The government, of course, was conducting

15  their further investigation, which led to some delay in our

16  ability to get here.  It is our, of course, anticipation that

17  if we were to get here earlier, maybe Mr. Leary would not have

18  had the additional point and may have been in category I, which

19  instead of a sentencing range of 97 to 121 would be at a

20  sentencing range of 87 to 108.

21            I bring that to the Court's attention because it bears

22  upon my client's mind-set of wanting to accept responsibility

23  and move forward with the resolution of this matter and try at

24  some point, at the nearest point, to move forward with his

25  life.  I will, of course, note the presence of the letter that

FbjWleaS

the government presented to the Court from the grandmother of
the deceased in the New Jersey case.  Of course, all of our
hearts go out to her, and there's no one here in this courtroom
other than, I would say, my client's grandmother who
understands the loss of a grandchild.  My client's grandmother
lost herself two individuals to the streets of Paterson.

I know the government in this matter argues that my
client was the epicenter of the drugs and the violence that
occurred in Paterson.  I would submit to the Court that the
violence and drugs that went on in the streets of Paterson have
been going on for a much longer period of time than my client
has been alive.  He himself got consumed along with many others
who live in that community and have unfortunately either
participated or have themselves been the victim either of the
drugs and/or the violence that occurred on the streets.

My client, first, at a very young age, did very well
in high school.  He did well academically.  He did well both in
sports, basketball and football.  And he was someone that had a
very bright future.  Circumstances that came along brought him
to this point.  He's made, of course, many, many judgment
errors and bad decisions that bring him here, and he's someone
who will be the first to tell you that he's not suggesting that
he is alone, that he accepts that his decisions are not
necessarily just a product of where he lived.  He himself knows
that there are decisions that he should have made that would

FbjWleaS

1    not have brought him to this place, but I will suggest to the

2    Court, though, that as we indicated in our sentencing

3    memorandum, a 60-month sentence would be appropriate and

4    sufficient in this particular matter.

5            I understand that the Court may believe because of the

6    violence that my client has either been involved with or

7    alleged to have conducted himself in that that may not be

8    enough time.  However, I would suggest to the Court that there

9    are reasons to be optimistic for the future of this young man.

10   One is the fact that we have so many people here in support of

11   him; not only his grandmother, not only his mother, but his

12   young daughter, the mother of his child, and also his brother,

13   who have been in this building on every occasion that this case

14   has been heard.  They go on every occasion to visit him at the

15   MDC, so there is a network of people, as indicated by the

16   letters, the 16 letters, that the Court received.  There's a

17   network of people who are there to support him when he

18   eventually is released, and eventually he will be.

19           And because he understands that he eventually will be

20   released, he himself has started to prepare himself for that

21   day.  One of the things that Ms. London and I have talked about

22   that is very encouraging is the fact that he's taken the time

23   to start taking the GED program.  Ms. London has told me in her

24   20-plus years of practice in this building, the number of

25   people who have on their own initiative gone out to prepare

FbjWleaS

1    themselves and have taken the GED is very, very small.  I think

2    she may have had only one or two prior clients who have done

3    that on their own, because as the Court knows, there is no GED

4    program within MDC.  The clients who choose to decide, who want

5    to take the GED program, they have to beg and borrow from old

6    book, books without pages in them.  They themselves have to

7    initiate the need or the want to be better, and this is only

8    one of the many ways that these clients have to show the Court

9    that they have tried to turn a corner.  And this is what he has

10    done, particularly in this case.

11          I will also note that in the letter that he wrote to

12    the Court, very well spoken, it's not a letter that we helped

13    him write.  He wrote it all on his own and gave us a copy of

14    the letter, which of course we provided to the Court, a very

15    eloquent letter, a letter that speaks to his time used very

16    well while being incarcerated as a time for self-reflection and

17    who he wants to be.  As the Court will note, there's a young

18    lady and young child in the courtroom.  That's his young

19    daughter, and he uses her new life in this world as an

20    opportunity to see that there's a better place for his young

21    daughter, and he wants to be part of that.  So in order for him

22    to be a productive member of society, to be a productive parent

23    to that young girl, he understands and now has started taking

24    the steps to turn that corner to be a much better person and a

25    law-abiding person, of course.

FbjWleaS

|1|          What I submit to the Court is that there's not many

|2| clients that I have met, but there's quite a few that

|3| Ms. London has met, so this individual, Mr. Leary, stands out

|4| to her as someone who deserves an opportunity with a sentence

|5| of 60 months.

|6|          I would also note, too, that Mr. Leary is a much

|7| different person that sits here than when I first met him.  He

|8| understands that the decisions that he made are severe.  He

|9| understands that he will sustain a severe penalty for the

|10| judgments and the errors and the violations of the law that the

|11| Court is here to sentence him on today, as he will be sentenced

|12| in New Jersey as well.  The Court there has made a

|13| determination based on the evidence that they have for him what

|14| a sentence should be there, and that's taken into account here

|15| in the advisory guidelines which the Court has here.  It's

|16| taken into account, instead of criminal category I, he's now

|17| criminal category II.  Instead of being a level 27, he received

|18| an additional point for the violence and the possession of the

|19| weapon, which has been alleged in these matters.  So I would

|20| suggest that if the Court were inclined to give a higher

|21| sentence, I would suggest to the Court that what the Court has

|22| in front of her Honor is a range that already encompasses the

|23| violence and/or the possession of a weapon, which I'm sure the

|24| people will point out when they have an opportunity to speak to

|25| your Honor.

FbjWleaS

1        Based on that, Judge, I'm going to ask the Court to

2   consider a sentence of 60 months to run concurrently with the

3   time, and I understand that the Court has a right to run either

4   this sentence partially concurrently, totally concurrently --

5   excuse me, partly consecutive or fully consecutive or

6   concurrently.  I ask the Court to allow for the sentence in

7   this matter to run concurrently with the time that he will be

8   sentenced to in the New Jersey matter.

9        Thank you for your time.

10       THE COURT:  Thank you, Mr. Bell.

11       Ms. Geraci.

12       MS. GERACI:  Your Honor, if I may, I just want to

13  acknowledge some family members of the victim, Nyjavar Jackson,

14  who are in court today.  Obviously this is in relation to the

15  Passaic County prosecutor's case, but they did decide to come

16  today.  One is Cheryl Burke.  My understanding is she's sitting

17  right there, and she is the paternal grandmother of

18  Mr. Jackson.  Marie Harris is Ms. Burke's sister, sitting right

19  here.  Maisha Coley is Ms. Harris' daughter and Ms. Burke's

20  niece.  Yusuf Blanford is Ms. Burke's grandson, and Ray White

21  is Mr. Jackson's father, and they all came to court today.  I

22  did speak to them.  They don't wish to address your Honor

23  beyond the letter your Honor has received.

24       THE COURT:  Thank you for your letter, Ms. Burke, and

25  thank you all for being here today.

FbjWleaS

1          MS. GERACI:  Your Honor, I'll rest primarily on the

2     submission to the Court, but I just want to point out a few

3     things.  As the Court's aware, this defendant is a

4     self-admitted member of the violent street gang which has

5     terrorized the city of Paterson for decades.  This defendant

6     sold drugs in gang-controlled areas in Paterson, New Jersey,

7     for literally his entire adult life.  His postarrest statement

8     made clear that he has been selling since he's 18 years old,

9     and really just the only time he wasn't selling was really when

10    he was arrested and in jail.

11          In this conspiracy, in the short time during which he

12    was released on bail conditions to the time he was arrested in

13    connection with this case, his sales have amounted up to a

14    kilogram of heroin, just in this charged conspiracy.

15          THE COURT:  Actually, that brings me to one of the

16    other issues that was raised in Mr. Bell's letter, and I

17    neglected to ask you about that directly.  The defense took

18    issue with your characterization of the current crime as a

19    return to drug selling and raised the question of whether the

20    government was seeking to impute drug-selling activity outside

21    of the particular time frame.

22          MS. GERACI:  Your Honor, I'll say two things about

23    that.  Within the charged conspiracy, the weight that he has

24    pled to is an appropriate weight factually for the time period

25    of 2012 through his arrest in 2014.  However, it is a fact that

FbjWleaS

1    in his postarrest statement, he told law enforcement, and I

2    have it in front of me.  I have the 302 that I can pass up to

3    the Court, that he is hustling now and has been since he was 18

4    years old when he first got into the drug game.  So it's the

5    government's position that he pled guilty to the charged

6    conspiracy and the weight's appropriate for that time frame.

7    However, it is accurate to say that he returned to selling

8    because, in fact, he had been selling since he was 18.

9              THE COURT:  Thank you.

10             After Ms. Geraci finishes speaking, Mr. Bell, I'll

11   give you the opportunity.

12             MR. BELL:  Thank you.

13             MS. GERACI:  Your Honor, I think importantly for this

14   defendant, this defendant has been extremely violent, despite

15   his very young age.  Information that we have in this case

16   indicates that he regularly carries firearms in connection with

17   his drug dealing and that he's been responsible for starting a

18   number of violent disputes that have erupted in the streets of

19   Paterson between rival gangs over drug territory.  In fact, one

20   of the disputes that he sort of instigated is a longstanding

21   neighborhood street war that's described in our letter, and it

22   is still going on today, with back-and-forth shootings between

23   two areas of Paterson.

24             As your Honor's aware, the defendant pled guilty

25   earlier this year, in April, to aggravated manslaughter in

FbjWleaS

1    connection with the murder of Nyjavar Jackson.

2            Going back a little bit to a notation in the defense

3    submission, the government submits the Court should be

4    skeptical of the defense characterization or assertion that

5    he's actually not involved in this murder but simply pled

6    guilty in order to resolve the case.  That's not information

7    that we have, and the Court should be skeptical of that, given

8    that that case is due to be sentenced in just a few weeks.  The

9    defendant did plead guilty to aggravated manslaughter in that

10   case.

11           While he was released on bail in connection with that

12   matter, he went not only back to selling drugs in the

13   Bloods-controlled areas of Paterson, but he also possessed

14   weapons, including a defaced firearm, and another firearm with

15   which he engaged in further violence.  He shot an individual

16   named Kasim McCaskill four times.  The government submits the

17   public needs protection from this defendant and it's why for

18   the first time in this case we are seeking a

19   top-of-the-guidelines range.  We do feel that his criminal

20   history to date does not reflect his actual dangerousness to

21   the community.

22           THE COURT:  Thank you.

23           Mr. Bell.

24           MR. BELL:  Yes.  Thank you.  On the issue of the age

25   when my client supposedly started, it is our information that

FbjWleaS

1    Mr. Leary, from a factual matter, was 17 years of age when he

2    was arrested on the New Jersey matter.  He was not released

3    until he was 19 -- well, right at the end of 18.  He was almost

4    19 years of age when he was released from custody on the New

5    Jersey matter.  So from a factual standpoint, if the government

6    is alleging that he was dealing drugs at the age of 18, it's

7    consistent that he was not dealing drugs prior to being

8    arrested on the New Jersey matter.  It was after he was

9    released from the New Jersey matter that he began dealing

10   drugs.  So that was our contention, our issue with the

11   statement that he went back to dealing drugs, but we have no

12   information that prior to being arrested on the New Jersey

13   matter he was actually dealing drugs at that time.

14           THE COURT:  Ms. Geraci, do you want to clarify your

15   position?

16           MS. GERACI:  No.  I understand now the defense

17   position.  We're standing by our position that he began dealing

18   drugs at approximately age 18, and if the situation was that he

19   was not released until he was that age, that does make sense.

20   I believed he had been arrested previously.  I'm sorry.  I

21   believe that his arrest sort of was a bridge between the time

22   period in which he dealt drugs, but I understand what the

23   defense is saying and I don't dispute the 18-year mark as when

24   he started.

25           THE COURT:  Thank you.

FbjWleaS

1          Mr. Bell, anything further?  I didn't mean to cut you

2     off.  I just meant to interrupt you.

3          MR. BELL:  No problem.  I don't want to step out of

4     place.  I understand the Court wanted me to address this one

5     issue regarding age.

6          If I could, if the Court will allow me to discuss the

7     New Jersey matter, I could rest on our submission and our

8     follow-up letter regarding the New Jersey matter and how it

9     came to be that he took a plea in that matter.  As the Court is

10    fully aware --

11         THE COURT:  I have read carefully the submissions and

12    listened to what has been said here today.  If there is

13    something else you feel that I should hear as part of the

14    information before I make my decision, you can speak briefly.

15         MR. BELL:  Judge, I'll rest on our submission and I'll

16    rest on our letters, specifically on the issue of why he took

17    the plea and under the circumstances in which the government

18    decided to move in that direction.

19         THE COURT:  Thank you.

20         MR. BELL:  Thank you for your time.

21         THE COURT:  Mr. Leary, would you like to speak for

22    yourself before I decide your sentence?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Please stand.

25         Mr. Bell, would you pull the microphone closer to

FbjWleaS

1    Mr. Leary.

2              Mr. Leary, you don't have to lean into the microphone.

3    Just look at me and speak out, and I'll be able to hear you.

4              THE DEFENDANT:  I'd like to apologize to the Court and

5    my family and my community for my actions.  I take full

6    responsibility for what I'm in front of you for today.

7    Especially I want to apologize to my mother, my daughter, my

8    grandmother, who I shamed and embarrassed most.  I would like

9    to say that through my incarceration, I really got to sit down

10   and take God in my life and change my life all the way and that

11   I'm preparing for my future whenever I leave here.  If I was to

12   walk out of this courtroom today, I would make sure that you're

13   proud of me in any decision that you make that you give me,

14   your Honor.  I just want to let you know that I just want to

15   get in school when I get out and into college or something or

16   trade school, whatever, so I could be there for my daughter and

17   change my life and start having a regular, normal life.

18             THE COURT:  Thank you, Mr. Leary.  I am very glad to

19   hear you speak about what you see for yourself in the future

20   and the changes that you want to make in your life.  And the

21   most important person for you to make those promises to and for

22   is yourself.  Equally important, your family.  And so I'm glad

23   that you've made them to me today, but you're the one who's

24   going to have to put them in practice and live up to that, so

25   write them on your heart, write them on your forehead so you

FbjWleaS

1    can see them when you look in the mirror, make them expressly

2    to your family every time you see them, and then live that.

3    And that's crucial.  That's how you show that you're an

4    honorable man who deserves to be treated with honor and whose

5    child should look up to him.

6           Now I'm going to ask that everyone sit quietly for

7    just a few minutes while I reflect on everything I've heard and

8    make my final decision about sentencing and then I will explain

9    it and announce it.  I've asked Ms. Ng to get a little DVD that

10   we have.  It uses the Sesame Street characters and it's for

11   helping families help young children to understand when people

12   are away in prison and so Ms. Ng is going to come out and give

13   that to Mr. Leary's family.

14           (Pause)

15           THE COURT:  Thank you for your patience.  I adopt the

16   factual recitations set forth in the presentence report, but I

17   do intend to make a change in paragraph 54 to reflect my

18   finding as to gang membership.  If you all would turn to page

19   13, paragraph 54, the second line ends with the words "and was

20   a close" and then the next line begins with "associate of

21   members of the Fruit Town Brims and the 9-3 sets."  I am

22   directing probation to change that to "was a member of the

23   Fruit Town Brims and the 9-3 sets of the Bloods," so I'm

24   deleting the words "close associate of" and changing "members"

25   to "member" singular.

FbjWleaS

1          Is that consistent with the government's proffer?

2          MS. GERACI:  Your Honor, our belief is that he's not a

3     member of the Fruit Town Brims, but rather just a member of the

4     9-3 set.  He may also be an associate of the Fruit Town Brims,

5     but for certain he's a member of the 9-3, so perhaps your Honor

6     could make that change.

7          THE COURT:  Thank you for clarifying that.

8          MS. GERACI:  Thank you, Judge.

9          THE COURT:  And so it will read "was a member of the

10    9-3 set of the Bloods."

11         This Court has discretion, taking into account the

12    applicable statutory provisions in exercising its power under

13    Section 3553(a) of Title 18, to determine the particular

14    sentence to be imposed in each particular case.  That law

15    requires the Court to consider a number of specific factors and

16    sentencing goals, including the nature and circumstances of the

17    offense; the defendant's history and characteristics; the need

18    for the sentence imposed to reflect the seriousness of the

19    offense, promote respect for the law, and provide just

20    punishment, deterrence, protection of the public; and the

21    provision of needed educational and vocational training in the

22    most effective manner.  The Court also has to consider the

23    types of sentences that are available, the applicable

24    provisions of the Sentencing Guidelines, and the need to avoid

25    unwarranted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct.

This Court is required to impose a sentence that is sufficient, but not greater than necessary, to comply with the statutory sentencing purposes.  As to the Sentencing Guidelines, I conclude that the applicable guideline offense level is 29 and that the applicable criminal history category is II, for the reasons that are detailed in the presentence report.  Accordingly, the advisory guideline range for a custodial sentence is from 97 to 121 months, and I've used the November 1, 2015, edition of the Sentencing Guidelines manual in making these determinations.

I have considered whether there are any factual circumstances here warranting a departure within the guidelines system from that guideline range, and I find that no departure is warranted.

I have gone on to consider all of the statutory sentencing factors and goals and all of the facts that have been put before me in light of those factors and goals.  I will speak to certain of the factors specifically now.

As to the nature and circumstances of the offense, Mr. Leary was a street-level dealer in a large drug conspiracy. He is being held personally accountable here for the distribution of between 700 grams and 1 kilogram of heroin, a very significant amount of a very dangerous drug.  In selling these drugs, he played a role in a much larger system of drug

distribution that put dangerous drugs into already challenged

communities and furthered the operations of one of the most

dangerous gangs in Paterson, New Jersey, and he was a member of

that gang.

During the commission of this offense, he carried

firearms and he was involved in a dispute with a rival gang in

which he shot another individual.  The criminal conduct here is

very serious.

As to Mr. Leary's history and characteristics, his

mother was a teenager when he was born.  His father was an

inconsistent presence in his life, and his father was

frequently in and out of prison.  It appears that the first

significant time that he was able to spend with his father was

when he himself went to prison.

While his mother was finishing high school, he was

cared for by his grandmother, who committed herself to do her

best to keep him out of the gang activity and violence that

plagued the streets of Paterson, and he performed well in high

school during that period.  After he finished the ninth grade,

he and his mother moved away, and he didn't have the

stabilizing influence of his grandmother.  He joined in with

the wrong crowd, and specifically it appears that he became

involved in violent gang activity.

At the age of 17, in 2010, he was charged with acting

together with another person to commit a murder, and the family

1    members of the person who was killed are here today, and the

2    letter that I received today speaks volumes of the pain that

3    they suffered then and continue to suffer by reason of the loss

4    of their family member.

5          Mr. Leary also faced charges of possessing a defaced

6    firearm.  He was held in custody at a correctional facility in

7    Newark, and seven of his male family members were there also.

8    At that time, he acknowledged in writing that he was a member

9    of the gang.  It's clear that he didn't have strong male role

10   models growing up.  He is responsible for his decisions and I

11   hear and understand today that he is taking responsibility for

12   those decisions.  He has pleaded guilty to aggravated

13   manslaughter in connection with the 2010 incident and also to a

14   2013 charge of defacing a firearm, specifically, a Glock pistol

15   that he possessed unlawfully and that was loaded with

16   hollow-point bullets, again, a very dangerous, very, very

17   dangerous situation.

18         When he got out on bail, he tried to reenroll in high

19   school.  Unfortunately, he wasn't able to do that because of

20   his age.  He again showed initiative in trying to equip himself

21   to live differently by enrolling in a community development

22   corporation, Youth Build Program, but because of the pending

23   state charges, he was asked to withdraw.  His girlfriend was

24   pregnant.  He didn't have any money.  He didn't have a high

25   school diploma.  He didn't have marketable skills.  He turned

1   back to the streets of Paterson, again, a decision that he made

2   under very, very challenging circumstances.  And, frankly, one

3   of the tragic things about our society, the way it is, is that

4   people who are in the weakest position to make good decisions

5   are required and expected to show strength that we don't always

6   challenge people in the middle class to show.  But nonetheless,

7   in order to protect our communities, in order to make sure that

8   we aren't all living in anarchy, we do demand that of everybody

9   in society, even the people who are in the hardest position to

10  make the good decisions.  And that is why it is important that

11  I recognize that this was a decision that Mr. Leary made, and

12  it's also very important that he recognizes it and that he has

13  the capacity going forward to be making decisions for himself,

14  that he has the challenge of making good decision, even when

15  they're hard.

16          He went back into the local gang culture of drug

17  dealing and violence, and eventually he was arrested in

18  connection with this offense on which we are here today.  He

19  also has a history of substance abuse.  He started consuming

20  alcohol at 19, and at 20, he started smoking marijuana and

21  using mollies, and the probation department recommends that I

22  find, and I have made this finding by adopting the

23  recommendation, that he poses a high risk for future substance

24  abuse.

25          Mr. Leary has a serious and violent criminal history

FbjWleaS

that is understated to a degree by the criminal history section
of the presentence report.  I note that he was arrested for
this offense while he was out on bail for the homicide and
firearms offenses.  I also note, however, that he's been
getting regular visits from his family, from his grandmother,
his mother, his girlfriend, and his daughter.  And he has said
in his letter, and he said here in court today and his lawyer
said for him, that their influence has inspired him to want to
turn his life around and to take steps to begin to turn his
life around, and that is a very good thing.  And his family
members who had opportunities to be with him under different
circumstances tell me that in that context he is respectful and
caring and family oriented.  These are good things as well.

         Mr. Leary clearly has a strong, supportive family
network that is ready to embrace him and wishes to help him
when he is released from custody.  And in his own letter to the
Court and his statements here today, he has expressed what I
believe is sincere remorse, and he has specifically accepted
responsibility for his actions.

         It is noteworthy and commendable that he has been
proactive in trying to put himself in a position to get his
GED, making those efforts even though there isn't a specific
program for it, that he wants to go to college, that he has
visions of a career for himself.  It is important that he's
been working while he's been detained, because people aren't

FbjWleaS

```
 1    required to do that.  And he's also earned certificates at the
 2    MDC.  Those are good things, and I take them into account in
 3    making my decision.
 4              Mr. Leary's submission to the Court and statements
 5    here today indicate that he understands that it's necessary to
 6    leave behind the dangerous conduct and bad decision-making in
 7    his past and that he wants to make a better life for himself
 8    and his family in the future.  His past conduct, particularly
 9    his history of falling into violent criminal activity when his
10    legitimate desires have been frustrated, indicates, however, a
11    significant need for a period of custody with rehabilitative
12    training in order to protect the public, to cement the
13    deterrent effect of this prosecution, and to promote respect
14    for the law, as well as to punish Mr. Leary for his very
15    serious criminal activity.
16              The sentencing considerations of public protection and
17    promotion of respect for the law also require that the very
18    challenged community of Paterson, New Jersey, have a breathing
19    space in which it can take steps to address its drug and youth
20    violence issues in an atmosphere of reduced violence and drug
21    trafficking, and the need to avoid unwarranted disparities also
22    counsels in favor of a substantial custodial sentence.
23              I find that the advisory guideline range includes a
24    sentence that is reasonable within the meaning of the law,
25    appropriate, and no greater than necessary to satisfy the
```

FbjWleaS

statutory purposes of sentencing.  I acknowledge and I will
take into account in imposing the sentence the concerns that
underlie the government's recommendation for a sentence at the
high end of the guideline range.  I will now state the sentence
that I intend to impose.

        Mr. Leary, would you and your attorneys please stand.

        Mr. Leary, it is the judgment of this Court that you
are to serve 109 months of imprisonment -- that is 109 --
followed by five years of supervised release.  The standard
conditions of supervision 1 through 15, as detailed in the
Sentencing Guidelines manual, will apply.  You will be subject
to the following mandatory conditions:

        You must not commit another federal, state, or local
crime.  You must not illegally possess a controlled substance.
You must not possess a firearm or destructive device.

        I will suspend the normal mandatory drug-testing
condition because I will include the recommended special
condition requiring drug treatment and testing.  You must
cooperate in the collection of DNA, as directed by the
authorities.  You must also meet the following special
conditions:

        You must submit your person, your residence, your
place of business, your vehicle, and any other property,
computers, electronic communications, data storage devices,
and/or other media under your control, to a search on the basis

FbjWleaS

 1    that the probation officer has a reasonable suspicion that

 2    contraband or evidence of a violation of the conditions of

 3    release may be found.  Any search must be conducted at a

 4    reasonable time and in a reasonable manner.  Failing to submit

 5    to a search may be grounds for revocation of supervised

 6    release.  You must inform any other residents that the premises

 7    may be subject to search pursuant to this condition.

 8            You must participate in an outpatient treatment

 9    program approved by the United States Probation Office.  The

10    program may include testing to determine whether you have

11    reverted to the use of drugs or alcohol.  You'll be required to

12    contribute to the costs of the services rendered as a

13    co-payment in an amount determined by the probation officer,

14    based on your ability to pay or the availability of third-party

15    payment.

16            I authorize the release of available drug treatment

17    evaluations and reports to the substance abuse treatment

18    provider, as directed by the probation officer.

19            You must engage in educational and job development

20    training programs, as directed by the probation officer.

21            And you must report to the nearest probation office

22    within 72 hours of release from custody.  You will be

23    supervised by your district of residence.

24            In light of your financial circumstances, I will not

25    impose a fine on you.  I will order that you pay to the United

FbjWleaS

1      States the mandatory special assessment of $100.  This is

2      payable in quarterly installments of $25 through the Bureau of

3      Prisons inmate financial responsibility program.  You must

4      inform the probation department of any change in your financial

5      circumstances and notify the United States Attorney for this

6      district within 30 days of any change in mailing or residence

7      address that occurs while any portion of the special assessment

8      remains unpaid.

9              I intend to recommend to the Bureau of Prisons that

10     Mr. Leary be given an opportunity to participate in the

11     residential drug abuse treatment program, or the RDAP, and

12     that, as Mr. Leary may know, is an intensive program toward the

13     end of your term that gives you intensive substance abuse

14     avoidance treatment and also job skills training.  If you

15     complete that successfully, you can earn additional time off

16     your sentence so that you don't have to serve the entire

17     sentence.  This is another incentive for you to keep those

18     promises that we were talking about earlier, because the Bureau

19     of Prisons takes into account your history in the facility,

20     your behavior, in deciding whether to let you do this program.

21     So it's another thing you can do for yourself.  Keep a clean

22     record and make sure that you can be eligible for this program,

23     because it will help you get out faster and help you after you

24     are out.

25             I will also recommend that the Bureau of Prisons

FbjWleaS

1    afford Mr. Leary an opportunity to participate in educational

2    and vocational training programs.

3           Are there additional recommendations that defense

4    counsel would ask me to make?

5           MR. BELL:  Just as to his designation, Judge.

6           THE COURT:  Yes.

7           MR. BELL:  We were considering whether the Court,

8    nearest location, of course, either to Fairton, Schuylkill, or

9    Fort Dix in New Jersey.

10          THE COURT:  How do you spell the middle one;

11   Schuylkill did you say?

12          MR. BELL:  Maybe it's Schuylkill.

13          THE COURT:  Schuylkill, the one in Pennsylvania?

14          MR. BELL:  Yes, Judge.

15          THE COURT:  I will make that recommendation, that he

16   be designated to one of those facilities or another suitable

17   facility in the New York-metropolitan area in order to

18   facilitate his family ties, to enable his family to keep up

19   with him, because that is so important.

20          MR. BELL:  Thank you.

21          THE COURT:  Counsel, do you know of any legal reason

22   why the sentence should not be imposed as stated?

23          MR. BELL:  No, your Honor.

24          MS. GERACI:  No, your Honor.

25          THE COURT:  The sentence as stated is imposed.

FbjWleaS

```
 1              I must say something important to you about appeal
 2      rights.  To the extent you have not given up your right to
 3      appeal from your guilty plea, you have the right to appeal this
 4      sentence.  If you are unable to pay the cost of an appeal, you
 5      may apply for leave to appeal in forma pauperis.  At your
 6      request, the clerk of the court will file a notice of appeal
 7      for you.  Any notice of appeal must be filed within 14 days of
 8      the judgment of conviction, so make sure that you speak to your
 9      attorneys about this today, because the deadline is short.
10              Ms. Geraci, are there remaining counts or underlying
11      indictments that need to be addressed?
12              MS. GERACI:  Yes, your Honor.  At this time, the
13      government moves to dismiss the underlying indictments with
14      respect to Mr. Leary.
15              THE COURT:  That motion is granted.
16              Mr. Leary, the crime you committed was very serious.
17      The length of the sentence that you've received today reflects
18      that, and as we've discussed, a whole lot of bad choices have
19      brought us to this day.  And so I urge you to think now and
20      every day for the rest of your life about the possible
21      consequences of your actions, for yourself, for your community,
22      for other people, before you take them so that the decisions
23      that you make from now on and for the rest of your life will be
24      ones that are healthier and better and safe and honorable ones
25      and ones that you would want your daughter to emulate.
```

FbjWleaS

1          Your past choices brought you this justifiably long

2     sentence, but your expression of your determination to turn

3     your life around and provide a good example for your daughter

4     and your family's strong support of you have persuaded me to

5     give you a sentence that is somewhat shorter than the sentence

6     I would have given you under other circumstances, given all the

7     things that have happened in the past.  I have also given you a

8     longer supervised release term than the probation department

9     recommended.  I did that in order to make sure that you have

10    both the opportunity and the obligation to change your way of

11    life for good.  And I mean that in both senses of the term, for

12    good meaning you're not going to turn back, and also that your

13    contribution to society and the rest of your life should be

14    good.

15         You are young, and you have a long life ahead of you,

16    and you have a strongly supportive family, your mother, your

17    grandmother, your partner, and you have a daughter, and they

18    all want to help you during this time while you're in custody

19    and when you transition back to life within your community on

20    your release from prison.  You're going to have the

21    opportunity, even while you're in prison, to show your family

22    and to show me that you can keep these promises that you've

23    made here today.  Make choices and take steps every day to

24    ensure that the rest of your life will be one of freedom and of

25    positive contributions to your family and to the community.

 1          This longer term of supervised release also gives you

 2    extended support and access to services in reestablishing your

 3    life.  And if you do well in the first few years of the

 4    supervised release, probation may support you in applying to

 5    have the supervised release terminated earlier.  It is always

 6    an occasion of joy when I'm able to do that.

 7          I want to put it one other way.  I urge and challenge

 8    you now, if you haven't done so already, to promise yourself

 9    and promise your family that you'll never again do anything

10    that could even put you at risk of going back to prison or

11    serving further time than I've imposed on you today and than is

12    expected in this Jersey sentence.  Your freedom is too valuable

13    for you to do anything other than that, and I hope your family

14    is precious enough to you that you will do that for them and be

15    the kind of father of whom your daughter and the rest of your

16    family can always be proud.  Be an encouragement and a good

17    example to her and your family while you're in prison, because

18    I know they've been working hard already to be encouraging to

19    you.  They're going to continue to work hard to be encouraging

20    to you, and this is something that you can do for them and that

21    you should do for them, and I wish you and your family strength

22    and courage during this time.

23          When you're released from your term of custody, you'll

24    have the guidance and support of the probation department in

25    reestablishing your day-to-day life while you're on supervised

FbjWleaS

1    release.  The people in probation really are committed to

2    helping you succeed, and they have knowledge and resources that

3    can be helpful to you.  They've been down this road with a lot

4    of people and they've looked into what's helpful and they have

5    connections to programs.  It's not easy to live under

6    supervision, but it's required because this is a court order,

7    and it's something that will help you to build your life.  So

8    please take the obligation in that spirit.  The people in

9    probation really are committed to helping you succeed in

10   turning around.

11            I have to also caution you that you just flat have to

12   comply strictly with all of the conditions that I set for your

13   supervised release.  If you're brought back before me for

14   violating any of those conditions, I may send you right back to

15   prison, so please don't ever put me in a position of having to

16   make that decision.  Thank you all for listening.  I know that

17   you can succeed and so I hope that I never see you again

18   because if I don't see you again, that means that you're

19   succeeding.

20            I will direct that counsel be provided with an amended

21   copy of the presentence report reflecting the correction that I

22   ordered today, and that a complete, corrected copy be prepared

23   for the Bureau of Prisons and the Sentencing Commission.  All

24   other copies of the report must remain appropriately

25   confidential.  If an appeal is taken, counsel on appeal are to

FbjWleaS

1   be permitted access to the report, and I thank counsel for

2   their advocacy and their candor with the Court here today.

3   Again, thank you all for being here.  I would ask that the

4   marshals permit Mr. Leary to acknowledge his family members

5   when we adjourn as he is leaving the courtroom.

6           Counsel, is there anything else that we should take up

7   together today?

8           MS. GERACI:  No, your Honor.  Thank you.

9           MR. BELL:  Nothing further, Judge.

10          THE COURT:  Nothing further for me, counsel?

11          MS. LONDON:  No.  Thank you, your Honor.

12          THE COURT:  Thank you.

13          MR. BELL:  Thank you for your time.

14          THE COURT:  Keep well, everyone.  We're adjourned.

15                              o0o

16

17

18

19

20

21

22

23

24

25